756 June 16, 2016 No. 40

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Petitioner on Review,*

*v.*

AMANDA L. NEWCOMB,
*Respondent on Review.*

(CC 110443303; CA A149495; SC S062387)

On review from the Court of Appeals.*

Argued and submitted March 10, 2015, at Lewis & Clark Law School, Portland, Oregon.

Jamie K. Contreras, Assistant Attorney General, Salem, argued the cause and filed the brief for petitioner on review. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Andrew D. Robinson, Deputy Public Defender, Salem, argued the cause and filed the brief for respondent on review. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Lora Dunn, Animal Legal Defense Fund, Portland, filed the briefs for *amici curiae* Animal Legal Defense Fund, Association of Prosecuting Attorneys, National District Attorneys Association, Oregon Humane Society, and Oregon Veterinary Medical Association.

Before Balmer, Chief Justice, and Kistler, Walters, Landau, Baldwin, Brewer, Justices, and Linder, Senior Justice pro tempore.**

LINDER, S. J.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.

_____

 *  Appeal from Multnomah County Circuit Court, Eric J. Bergstrom, Judge. 262 Or App 256, 324 P3d 557 (2014).

 ** Nakamoto, J., did not participate in the consideration or decision of this case.

**LINDER, S. J.**

Defendant was convicted of second-degree animal neglect (ORS 167.325)[1] after she failed to adequately feed her dog, Juno, resulting in his malnourishment. Before trial, defendant moved to suppress blood test results showing that Juno had no medical condition that would have caused him to be malnourished, which in turn indicated that Juno was malnourished because he was starving. Defendant argued that the state had violated both Article I, section 9, of the Oregon Constitution, and the Fourth Amendment to the United States Constitution by failing to obtain a warrant before testing the dog's blood.[2] The trial court denied the motion and allowed the state to introduce the test results during trial. Defendant appealed to the Court of Appeals, which agreed with defendant that she had a protected privacy interest in her dog's blood that required the state to obtain a search warrant, unless the circumstances fit within an exception to the warrant requirement. *State v. Newcomb*, 262 Or App 256, 271, 324 P3d 557 (2014). Because the state had failed to obtain a warrant, and because no exception to the warrant requirement applied, the Court of Appeals reversed. *Id*. at 271-72. We allowed the state's petition for review to resolve whether defendant had a protected privacy interest in her dog's blood under Article I, section 9, of the Oregon Constitution or the Fourth Amendment to the United States Constitution. As explained below, on these facts, we conclude that she did not. We accordingly reverse

---

[1] Throughout this opinion, unless otherwise noted, we cite the 2009 versions of the relevant statutes, which were the versions in force when the events in this case took place. The statute defining animal neglect in the second degree, ORS 167.325 provides, in pertinent part,

"(1) A person commits the crime of animal neglect in the second degree if, except as otherwise authorized by law, the person intentionally, knowingly, recklessly or with criminal negligence fails to provide minimum care for an animal in such person's custody or control."

[2] Article I, section 9, provides, "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]"

the decision of the Court of Appeals and affirm the decision of the trial court.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

We recite the facts, and all reasonable inferences that they support, in the light most favorable to the trial court's denial of the motion to suppress. *See State v. Bailey*, 356 Or 486, 489, 338 P3d 702 (2014) (stating standard of review). The Oregon Humane Society received a report that defendant was abusing and neglecting her dog, Juno. In response to that report, Special Agent Austin Wallace, an animal cruelty investigator and certified police officer, went to defendant's apartment to investigate.[3] While the officer was speaking with defendant inside her apartment, he could see Juno in defendant's back patio area through the double sliding-glass doors. To the officer, who had seen "hundreds of emaciated animals," Juno appeared to be in a "near-emaciated condition," with "no fat on his body." He also noticed that Juno was "eating at random things in the yard, and *** trying to vomit." But Juno was dry heaving and "[n]othing was coming up[.]"

The officer asked defendant why Juno was in that condition—that is, why Juno appeared "near-emaciated." Defendant responded that she usually gave Juno dog food from WinCo, which she buys in small four-pound quantities, but that she had run out of it and was planning on buying more that evening. At that point, the officer concluded that

---

[3] The state has not disputed that Special Agent Wallace qualified as a government actor under the circumstances of this case. Special Agent Wallace was employed by the Oregon Humane Society, a private nonprofit entity, rather than a state or local law enforcement agency. However, he was also a certified police officer with authority to issue citations, and he acted pursuant to that certification in investigating animal cruelty complaints. *See* ORS 181.610(12)(b) ("law enforcement unit" for purposes of public safety standards and training includes private, nonprofit animal care agency that maintains animal investigation unit); ORS 609.652(2)(d) ("law enforcement agency" for purposes of animal abuse reporting laws includes only county or municipal animal control agency). Statutes enacted after the events in this case have clarified the cooperative role of privately employed persons certified as police officers—now termed "humane special agents"—in working with state and local law enforcement agencies to enforce animal welfare laws. *See* ORS 181A.340 (2013) (providing for "humane special agents" who may be certified as police officers); ORS 181A.345 (2013) (humane special agents shall work in cooperation with law enforcement agencies to enforce animal welfare laws).

he had enough evidence to corroborate the citizen report of neglect—Juno was near-emaciated and dry heaving, and defendant had admitted that she had no food for Juno. He therefore concluded that he had probable cause to believe that defendant had neglected Juno. He asked defendant for permission to take the dog in for medical care, but defendant, who thought her dog looked healthy, refused and became irate. The officer therefore took custody of Juno without defendant's consent, both as evidence of the neglect and because of the "strong possibility" that Juno needed medical treatment. He transported Juno to the Humane Society, where Juno would be housed and medically treated as appropriate. From medical tests, the officer expected also to be able to determine whether neglect charges were warranted or whether Juno should be returned to defendant.

Dr. Zarah Hedge, a veterinarian, treated Juno after the dog arrived at the Oregon Humane Society. From an initial examination, Dr. Hedge could identify nothing physically wrong with Juno, other than that "the dog was very thin." As part of standard practice, Dr. Hedge gave Juno a "body condition score." That score ranges from one—meaning emaciated—to nine—meaning obese. To score dogs on that scale, veterinarians determine, among other things, whether the dog's ribs and spine are visibly protruding (meaning that the dog is emaciated); or, on the opposite end of the scale, whether the veterinarian must actually touch the dog to be able to locate its ribs and spine (meaning that the dog is obese). After looking at Juno—whose ribs and vertebrae were visible without having to feel for them—Dr. Hedge gave him a body condition score of 1.5. But Dr. Hedge could not be certain, at that point, that Juno was emaciated due to malnourishment. Juno could have had a parasite or an intestinal or organ condition that caused him to be thin. She therefore drew a blood sample from Juno for laboratory testing.[4]

---

[4] At the motion to suppress, neither party called Dr. Hedge to testify because they were in agreement as to the tests she performed and the results. They therefore "stipulated" that she performed the tests and the tests showed that Juno had nothing medically wrong with him, which confirmed her initial diagnosis that Juno was malnourished. Some of the more detailed facts that we recite (such as her scoring of Juno's body condition) came out only at trial. We include them to provide a more complete narrative of the evidence placed before the jury after denial of defendant's motion to suppress; we do not rely on those added details in our examination of the trial court's pretrial suppression ruling.

Dr. Hedge's withdrawal of that blood sample, and the subsequent testing of it, is the central focus of this case.[5] The laboratory tests revealed nothing medically wrong with Juno that would have caused him to be thin; Dr. Hedge therefore concluded that Juno was malnourished and placed him on a special feeding protocol. As a result of that diagnosis, the officer cited defendant for second-degree animal neglect.

Before trial, defendant moved to suppress the laboratory test results, arguing that the officer lacked probable cause to take Juno into custody, and thus had unlawfully seized the dog. Defendant also argued that Dr. Hedge had engaged in an unreasonable search of defendant's property— *i.e.*, Juno—by drawing and testing Juno's blood without a warrant, in violation of Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution. In arguing that the blood testing was an unlawful search, defendant emphasized that dogs are personal property under Oregon law; defendant therefore took the position that dogs are "no different than a folder or a stereo or a vehicle or a boot" or other items of personal property. Even if Juno was lawfully taken into custody, defendant urged, the state could examine only the exterior of seized property without seeking a warrant. According to defendant, by withdrawing blood from Juno and testing that blood without a warrant, the state intruded into her personal property and revealed information not otherwise open to view, which violated her constitutionally protected privacy.

The prosecutor countered by first arguing that the officer had probable cause to believe Juno was being neglected, and therefore had lawfully seized Juno and taken him to the Humane Society for care. The prosecutor then turned to the withdrawal and testing of Juno's blood, arguing that

---

[5] Dr. Hedge also tested a feces sample. The record is unclear on how Dr. Hedge obtained the feces sample—*i.e.*, whether she actively withdrew it from Juno or tested a sample that he had already expelled. Because we conclude that the withdrawal and testing of Juno's blood did not invade a protected privacy interest on defendant's part, we need not separately discuss or analyze the admissibility of the feces sample; even an actively withdrawn feces sample is unlikely to be more intrusive than a blood draw in the circumstances presented by this case.

a dog, although personal property, is not a container and is not legally analogous to one because, as the prosecutor put it, a dog "doesn't contain anything"; instead, inside a dog is just "more dog." A more appropriate analogy, the prosecutor urged, was to test-firing a lawfully seized gun to determine if it is operable.[6] According to the prosecutor, in the same way, testing Juno's blood did not reveal private information concealed inside Juno, but instead confirmed that Juno was what the officer believed that he had seized—a malnourished dog. As an alternative theory justifying the warrantless withdrawal and testing of Juno's blood, the prosecutor urged that it was reasonable to provide medical care to a dog that had been lawfully taken into custody on probable cause to believe that the dog had been neglected.

The trial court denied defendant's motion to suppress. In doing so, the trial court first concluded that the officer had probable cause to believe Juno was neglected and therefore lawfully took Juno into custody. Next, the trial court agreed with the prosecutor that a dog is neither a container nor analogous to one, and stated that the closer analogy would be a medical examination and diagnostic analysis of a child taken into protective custody on suspicion of abuse. The trial court also viewed the testing of Juno's blood as more analogous to confirmatory chemical testing of a substance seized on probable cause that it is an unlawful drug, or to testing a lawfully-seized firearm for fingerprints. For those reasons, the trial court ruled that, once Juno had been lawfully taken into custody, neither Article I, section 9, or the Fourth Amendment required a warrant to medically test Juno's blood.

The case proceeded to a jury trial, and the jury unanimously returned a guilty verdict on the second-degree animal neglect charge. Defendant appealed, challenging the denial of her motion to suppress. In the Court of Appeals, the

---

[6] The prosecutor's reference appears to have been to a former statutory definition of firearm, pursuant to which some firearm-related charges, such as unlawfully carrying a concealed firearm, required proof that the weapon was or could immediately be made operable. *See, e.g., State v. Briney*, 345 Or 505, 200 P3d 550 (2008) (gun with broken firing pin did not qualify as "firearm" under ORS 166.210(3) (2007), which required weapon to be "designed to expel a projectile by the action of powder" and also to be "readily capable of use as a weapon").

parties largely renewed the arguments they had made to the trial court. The Court of Appeals agreed with the trial court that Juno's seizure was lawful, but disagreed that Juno's blood could be tested without a warrant. *Newcomb*, 262 Or App at 264, 271. The court concluded that the "extract[ing] and testing" of Juno's blood, even though Juno was lawfully in the state's custody, was a constitutionally significant intrusion into defendant's privacy, one that "exposed otherwise concealed information about the dog that served as evidence of a crime." *Id*. at 271. Because the intrusion was not justified by any recognized exception to the warrant requirement, the court declared that the extraction and testing of Juno's blood was an unlawful search under Article I, section 9. *Id*. at 271-72. The Court of Appeals therefore reversed defendant's conviction and remanded the case to the circuit court.

On review, the only issue before us is the lawfulness of testing Juno's blood; defendant no longer disputes that Juno was lawfully seized.[7] The chief point of contention between the parties is whether defendant had a protected privacy interest in Juno's blood once Juno was in the state's lawful custody and care. That, in turn, is essentially a disagreement over whether drawing and testing Juno's blood was a "search" for purposes of either Article I, section 9, or the Fourth Amendment. The parties further dispute whether, if the blood testing was a search for constitutional purposes, that search was reasonable in these circumstances despite the state's failure to get a warrant.[8]

---

[7] Defendant did not cross-petition on the issue of whether Juno was lawfully taken into custody and, consistently with the procedural posture of the case, does not now argue that Juno's custody was unlawful.

[8] The Court of Appeals did not consider the reasonableness of the search to have been preserved by the state, explaining that the state did not, on appeal or in the trial court, argue that the search was "reasonable under an established exception to the warrant requirement." *Newcomb*, 262 Or App at 271, n 13. And although the state, by way of a supplemental memorandum of authority, cited and relied on *State ex rel Juv. Dept. v. M.A.D.*, 348 Or 381, 233 P3d 437 (2010) (upholding as reasonable warrantless search of public school student despite lack of a recognized exception to the warrant requirement), the court considered that to be insufficient to preserve an argument that the testing of Juno's blood, if it was a search, was reasonable even though it did not fit an established exception to the warrant requirement. *Newcomb*, 262 Or App at 271 n 13. Given our determination that there was no search, we do not need to resolve whether the state's "reasonableness" argument was adequately preserved.

Consistently with our approach to analyzing constitutional claims, we examine first whether the state's conduct constituted a search under Article I, section 9, and then consider defendant's Fourth Amendment claim only if we conclude that no state constitutional violation occurred. *See Sterling v. Cupp*, 290 Or 611, 614, 625 P2d 123 (1981) (describing first-things-first approach).

## II.   ANALYSIS

A.   *Article I, Section 9*

Article I, section 9, of the Oregon Constitution provides in part: "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure." Implicit in that guarantee against unreasonable searches and seizures is a significant limitation: The provision applies only when government officials engage in conduct that amounts to a search or a seizure. *State v. Howard/Dawson*, 342 Or 635, 639, 157 P3d 1189 (2007); *State v. Owens*, 302 Or 196, 205-06, 729 P2d 524 (1986). For purposes of Article I, section 9, a search occurs only if governmental action invades "a protected privacy interest." *State v. Wacker*, 317 Or 419, 426, 856 P2d 1029 (1993). A seizure occurs only if, through governmental action, "there is a significant interference with a person's possessory or ownership interests in property." *Owens*, 302 Or at 207. Although the two interests—privacy and ownership/possession—are not necessarily coextensive, property law concepts of ownership and possessory rights can bear significantly on the existence or nonexistence of a protected privacy interest in the property. *Howard/Dawson*, 342 Or at 642-43 (discussing principle; concluding that privacy interest in property was extinguished by abandonment of rights of dominion and control over property). Ultimately, "the privacy protected by Article I, section 9, is not the privacy that one reasonably *expects* but the privacy to which one has a *right*." *State v. Campbell*, 306 Or 157, 164, 759 P2d 1040 (1988) (emphasis in original; citation omitted). And the right to privacy that Article I, section 9, protects is the freedom from scrutiny as "determined by social and legal norms of behavior, such as trespass laws and conventions against eavesdropping." *Id*. at 170 (citations omitted).

The general issue that this case presents is one that has come before the court with some frequency before: the extent to which the state may examine property without a warrant after it has lawfully seized that property in the course of a criminal investigation. On the other hand, this case presents—as most cases raising search and seizure issues do—its own set of distinctive facts and circumstances within that context. Here, the seized property was a living animal—Juno, the dog—not an inanimate object or other insentient physical item of some kind. Central to the issue that we must resolve is whether that distinctive fact makes a legal difference.

In defendant's view, it does not. Defendant relies on ORS 609.020, which states: "Dogs are hereby declared to be personal property." Defendant maintains that, for purposes of Article I, section 9, a dog is the same as any other item of property that can be lawfully owned or possessed, such as a stereo or a folder. As a general proposition, under that construct, when the state lawfully seizes inanimate property, it may "observe, feel, smell, shake and weigh" lawfully seized property or otherwise "thoroughly examine" its exterior without obtaining a warrant. *Owens*, 302 Or at 206. But examining the "interior" of the property to reveal other property that it may contain is another matter. Whether such an examination is an unlawful search depends on whether the contents are open to view or the property "by [its] very nature announce[s] [its] contents (such as by touch or smell) ***." *Id*. (no warrant required to withdraw and test white powder visible in lawfully seized clear vial to confirm probable cause that powder was cocaine); *see also State v. Heckathorne*, 347 Or 474, 484-85, 223 P3d 1034 (2009) (same result for lawfully seized opaque metal cylinder where the smell of gas escaping from cylinder provided probable cause to believe cylinder contained unlawful substance). Defendant's position is that Juno was the legal equivalent of a closed opaque container, one that did not announce its contents, so that a warrant was required before the state could examine its contents.

In *Owens*, however, this court recognized that "not all containers *** merit the same protection under Article I, section 9." 302 Or at 206. The same is true of personal

property more generally: Not all things that can be owned and possessed as personal property merit the same constitutional protection in the same circumstances. With regard to living animals, and domestic pets in particular, we have recognized that "some animals, such as pets, occupy a unique position in people's hearts and in the law," one that is not well-reflected in the "cold characterization of a dog *** as mere property." *State v. Fessenden/Dicke*, 355 Or 759, 769, 333 P3d 278 (2014) (latter quotation from *Rabideau v. City of Racine*, 243 Wis2d 486, 491, 627 NW 2d 795, 798 (2001)). Whether defendant had a protected privacy interest that was invaded by the withdrawal and testing of Juno's blood requires us to examine the nature of the property involved and the circumstances of the governmental intrusion into that property.

As to the nature of the property involved—here, a living animal—we are aided by our analysis in *Fessenden/Dicke*. The issue there was whether the state could, without a warrant, lawfully seize an animal (a horse) believed to have been criminally neglected. In concluding that traditional exigent circumstances doctrine extended to animals in such a circumstance, this court explored the nature of the relationship of humans to the animals that they own and possess, as well as the social and legal norms that attend to that relationship. The observations that we made in that regard are helpful in the context of the legal issue that this case presents.

Under Oregon's statutes, animals generally, as well as dogs in particular, are deemed "property." 355 Or at 767-68 (citing statutes); ORS 609.020 (declaring dogs to be property). Animals generally therefore can be lawfully owned and possessed much as other property can be.[9] But the welfare of animals is subject to a series of explicit statutory

---

[9] Under Oregon law, there are many exceptions to a person's ability to lawfully own and possess certain animals. *See, e.g.*, ORS 167.365(1) (person commits crime of "dogfighting" if person knowingly "[o]wns, possesses, keeps, breeds, trains, buys, sells or offers to sell a fighting dog"); ORS 609.341 (special state permits required to keep "exotic" animals). There are also many limits on animal owners' rights of dominion and control over some animals. *See, e.g.*, ORS 609.098(1)(c) (unlawful to use dog as a weapon in the commission of a crime); ORS 811.200(1) (unlawful to carry dog on certain parts of a vehicle operated on highway without specified protective measures).

protections that are distinct to animals and do not apply to inanimate property. Indeed, "Oregon's animal welfare statutes impose one of the nation's most protective statutory schemes[.]" *Id*. The crimes of animal abuse and neglect are themselves reflections of the distinctive nature of animals as property. *Id*. at 767-69 (discussing animal neglect and other animal welfare statutes as illustrating unique legal and social status of animals). A person commits first-degree animal abuse if the person, with any of several culpable mental states, causes serious physical injury to or cruelly causes the death of an animal. ORS 167.330(1). A person commits second-degree animal neglect if the person, with any of several culpable mental states, "fails to provide minimum care for an animal in [that] person's custody or control." ORS 167.325(1). Significantly, the obligation to provide minimum care arises for anyone who has custody or control of an animal; it is not limited to those who have lawful possession or custody of the animal. "Minimum care," in turn, means "care sufficient to preserve the health and well-being of an animal" and includes, in addition to adequate nutrition, "[v]eterinary care deemed necessary by a reasonably prudent person to relieve distress from injury, neglect or disease." ORS 167.310(7). If the failure to provide minimum care results in death or serious physical injury, the crime is elevated to first-degree animal neglect. ORS 167.330(1).

Reflected in those and other laws that govern ownership and treatment of animals is the recognition that animals "are sentient beings capable of experiencing pain, stress and fear[.]" *Fessenden/Dicke*, 355 Or at 768 (quoting ORS 167.305(1)).[10] To be sure, the protection given to animals under Oregon law does not place them on a par with humans. Among other things, there are legally sanctioned ways for humans to kill animals, and many animals may be "treated or mistreated" by those who own or lawfully possess them as long as their treatment is within the boundaries of "good animal husbandry" or "animal research." *Id*.

---

[10] As we observed in *Fessenden/Dicke*, 355 Or 768 n 7, ORS 167.305(1) was passed in 2013, before the charges in that case were brought. Likewise, the charges in this case precede the enactment of that statute. We quote from the statute, as we did in *Fessenden/Dicke*, as background relevant to an overall understanding of the animal welfare laws and the policies that current and past statutes reflect.

at 768-69 (citing statutes; noting special legal protections for domestic animals, "colloquially known as pets"). The important point for this case, however, is not that Oregon law permits "humans to treat animals in ways that humans may not treat other humans." *Id.* at 768. What matters here is that Oregon law prohibits humans from treating animals in ways that humans are free to treat other forms of property.[11] Oregon law also places affirmative obligations on those who have custody of an animal to ensure that animal's basic welfare; those obligations have no analogue for inanimate property.

Those observations alone are not enough to resolve the issue before us. As an abstract proposition, we accept that a person who owns or lawfully possesses an animal, and who thus has full rights of dominion and control over it, has a protected privacy interest that precludes others from interfering with the animal in ways and under circumstances that exceed legal and social norms. Thus, for example, if a dog owner walks his dog off-leash down the street, and the friendly dog runs over to greet a passerby who pets it, that act of petting the dog would invade no possessory or privacy interest; a contact of that kind would fall well within social norms and conventions, even if by petting the dog the passerby discovers something concealed from plain view (*e.g.*, that under the dog's thick fur coat, the dog is skin and bones to the point of serious malnourishment). On the other hand, if the passerby produces a syringe and expertly withdraws a sample of the dog's blood in the time that it would take to greet and pet the dog, that contact would violate the owner's possessory and privacy interests, even if the passerby did so for a valuable scientific study (*e.g.*, whether local animals were infected with an easily-transmitted virus); such a contact would fall well outside social norms and conventions. As those examples suggest, determining the existence of a constitutionally protected privacy right in property depends not only on the nature of the property itself, but also on the nature of the governmental intrusion

---

[11]  A person can be as cruel or abusive as she wants to her own stereo or folder, and can neglect the maintenance of a car to the point where it will not operate, without legal consequence. The same is not true of an animal that a person owns or has custody of or control over.

and the circumstances in which it occurred. We must consider those, too, in resolving the issue before us.

Here, when Dr. Hedge tested Juno's blood, defendant had lost her rights of dominion and control over Juno, at least on a temporary basis. Juno at that point had been lawfully seized and taken into custody based on probable cause to believe that he had been criminally neglected. The specific neglect that the officer believed Juno to have suffered was that Juno was starving. Juno's physical appearance and behavior provided the officer with significant support for his belief—Juno was near-emaciated, was dry-heaving, and was "eating at random things" in the yard. The officer had, as well, a citizen report of neglect and defendant's own admission that she had no food for the dog. The officer, who believed Juno needed medical treatment, asked defendant for her consent to take Juno into custody for medical evaluation, but defendant refused. When the officer then seized Juno over defendant's protest, both to preserve evidence and to render aid to the dog, Juno was lawfully taken into the state's protective custody. *See Fessenden/Dicke*, 355 Or at 773 (animal entitled to "statutory protection" through seizure without warrant if officer has probable cause to believe animal has been criminally neglected, neglect is ongoing, and seizure is necessary to prevent further serious imminent harm to animal).

Juno was not beyond danger simply because he had been removed for the time from defendant's dominion and control, however. Juno's condition appeared serious and required medical attention. To ensure appropriate medical care for Juno, Dr. Hedge drew and tested Juno's blood to determine whether he was suffering from some other medical condition that might cause his malnourishment.[12] When

---

[12] After having noted that the officer seized Juno both to render aid and to preserve evidence, the Court of Appeals expressed uncertainty about Dr. Hedge's motivations for performing the later medical tests—whether they, too, were performed for the "dual purpose" to gather evidence and give medical treatment to Juno. *Newcomb*, 262 Or App at 264 (discussing seizure), 266 n 7 (discussing testing).

We agree that the suppression record could be better-developed on the point. But there was no dispute that the tests were run by Dr. Hedge for purposes of medical diagnosis, even if *the officer* anticipated that the test results could have potential evidentiary value, depending on what they showed. Indeed, defendant

the blood tests failed to reveal any other medical condition that would have caused Juno to be seriously emaciated, Dr. Hedge put Juno on a special feeding protocol.

Given the specific context involved here—the lawful seizure of a dog based on probable cause to believe the dog was suffering from malnourishment, followed by drawing and testing the dog's blood to medically diagnose and treat the dog—we conclude that defendant had no protected privacy interest in Juno's blood that was invaded by the medical procedures performed. In these circumstances, we agree with the state that Juno is not analogous to, and should not be analyzed as though he were, an opaque inanimate container in which inanimate property or effects were being stored or concealed. Juno's "contents"—in terms of what was of interest to Dr. Hedge—were the stuff that dogs and other living mammals are made of: organs, bones, nerves, other tissues, and blood. As the prosecutor argued at trial, inside Juno was just "more dog."[13] The fact that Juno had blood

---

acknowledged in her memorandum in support of the motion to suppress that the officer had advised defendant that he was taking the dog into custody "to receive veterinary care" and that Dr. Hedge then performed a "battery of laboratory tests" on Juno, after which she placed Juno on a feeding protocol. It was in that context that defendant and the state advised the court that they had no factual disputes about the testing, and they "stipulated" to the results of the medical tests that Dr. Hedge performed to spare her from appearing at the suppression hearing. *See* 359 Or at 760 n 4.

A medical professional who examines a victim of criminal abuse for purposes of diagnosis and treatment—whether the victim is human or animal—no doubt realizes that the results may have evidentiary value if a criminal prosecution ensues. But that reality does not alter the medically appropriate nature of the testing. Our obligation is to view the facts in the light most favorable to the trial court's denial of defendant's motion. Here, the trial court, in denying the motion to suppress, at least implicitly found that Dr. Hedge performed the tests for medical reasons by analogizing this case in its ruling to one in which an abused child taken into custody is medically examined for purposes of diagnosis and treatment.

[13] At least, that was true in this case. It might not be true under different facts. Dogs and other animals at least *can* be used as repositories of information and inanimate effects, and can have more inside them than just "more dog." Many animals—and dogs in particular—for example *are* repositories for information through the use of "microchip" technology that permits a scanner, from outside the dog, to retrieve information encoded on the microchip. *See generally Microchip implant (animal)* at https://en.wikipedia.org/wiki/Microchip_implant_(animal) (accessed May 30, 2016) (describing use of microchips placed under skin of farm and ranch animals, as well as domestic pets, as common means of identification).

It is at least doubtful that a dog's owner would have a cognizable *privacy* interest in the information planted in a dog for the specific purpose of being able

inside was a given; he could not be a living and breathing dog otherwise. And the chemical composition of Juno's blood was a product of physiological processes that go on inside of Juno, not "information" that defendant placed in Juno for safekeeping or to conceal from view.[14]

That fact has significance in the context of the legal and social norms for the care and welfare of animals that we have already discussed. A dog is personal property under Oregon law, a status that gives a dog owner rights of dominion and control over the dog. But Oregon law simultaneously limits ownership and possessory rights in ways that it does not for inanimate property. Those limitations, too, are reflections of legal and social norms. Live animals under Oregon law are subject to statutory welfare protections that ensure their basic minimum care, including veterinary treatment. The obligation to provide that minimum care falls on any person who has custody and control of a dog or other animal. A dog owner simply has no cognizable *right*, in the name of her privacy, to countermand that obligation. That conclusion follows with equal or greater force when, as here, the dog is in the state's lawful protective custody on probable cause that the dog is suffering injury as a result of neglect, at which point the owner has lost her property rights of dominion and control over the dog. An examination of the dog's physical health and condition in that circumstance, pursuant to a medical judgment of what is appropriate for diagnosis and treatment, is not a form of governmental scrutiny

---

to externally identify the dog. On the other hand, hypothetically, if what was planted "inside" the dog was a microchip containing stolen secret government data, the owner's or possessor's protected privacy interest, even if the dog had been lawfully seized on probable cause to believe it contained the stolen data, might be the same as in an opaque inanimate container. In short, whatever the answer to the question whether the owner has a protected privacy interest in an object planted inside a dog, the dog is at least more analogous to an inanimate container in such a circumstance.

[14] To be sure, Dr. Hedge had to extract Juno's blood to test it; she could not determine the chemical state of Juno's blood through some noninvasive procedure. As Groucho Marx famously quipped:

"Outside of a dog, a book is man's best friend. Inside of a dog, it's too dark to read."

But what Dr. Hedge withdrew here was "more dog," not a separate item of property that defendant had placed inside Juno to either safeguard or conceal from public view in the same way that property nested within other property involves. That fact, although not necessarily dispositive, properly bears on the analysis.

that, under legal and social norms and conventions, invades a dog owner's protected privacy rights under Article I, section 9.[15]

That conclusion resolves this case for purposes of Article I, section 9. We emphasize, however, that our decision is limited to the circumstances that this case presents. As we said in *Fessenden/Dicke*, 355 Or at 769-70:

> "As we continue to learn more about the interrelated nature of all life, the day may come when humans perceive less separation between themselves and other living beings than the law now reflects. However, we do not need a mirror to the past or a telescope to the future to recognize that the legal status of animals has changed and is changing still[.]"

Assessing an animal owner's constitutionally protected interests of possession and privacy in his or her animal in that evolving landscape of social and behavioral norms presents, at best, "difficult questions," and we are well-advised in that context "to observe the wise limitations on our function

---

[15] In her briefing in the Court of Appeals, defendant cited ORS 167.345(2), which authorizes police officers to, among other things, "impound" an animal if there is probable cause to believe the animal is a victim of any of several crimes, including animal neglect. After the animal has been impounded, a court "may order" the animal to be held at any animal care facility; that facility, in turn, "shall provide adequate food and water" to the animal and "may provide veterinary care." ORS 167.345(4)(a). Defendant did not make a developed argument under the statute, but did point out that there is no record in this case of a court order authorizing Juno to be "impounded," suggesting that the veterinary care given to Juno may have been without lawful authority.

It is less than certain whether and how that statute applies to individuals like Special Agent Wallace who, although certified as police officers, are employed by and serve the special mission of a private, nonprofit animal care agency that investigates complaints of animal abuse and has authority to issue citations for violations of animal welfare laws. *See* 359 Or at 759 n 3 (discussing statutory authority of such agents). It is also less than clear that, without a court order, an animal care facility would be relieved of the obligation to provide minimally adequate care to an animal in its custody. The animal neglect statutes that we have discussed effectively impose that obligation, regardless of a court order or other basis for an animal to be in the custody and control of someone other than the owner. On review to this court, defendant does not rely on that statute and we need not explore the implications of it. Worth pointing out, however, is that the lack of a court order, even if required by ORS 167.345(2), would not be a basis to suppress the results of Juno's blood tests. *See* ORS 136.432 (courts may not exclude relevant evidence "obtained in violation of any statutory provision unless exclusion of the evidence is required by" federal or state constitutions or other rules governing admissibility of evidence).

and to confine ourselves to deciding only what is necessary to the disposition of the immediate case." *Id*. at 770-71 (quoting *Whitehouse v. Illinois Cent. R. Co.*, 349 US 366, 372-73, 75 S Ct 845, 99 L Ed 1155 (1955)).

Consequently, our holding is confined to circumstances in which the state has *lawfully* seized a dog or other animal on probable cause to believe the animal has been neglected or otherwise abused. It is also confined to the general kind of intrusion that occurred in this case—a medically appropriate procedure for diagnosis and treatment of an animal in ill-health. In those particular circumstances, we conclude that the warrantless withdrawal and testing of Juno's blood did not violate Article I, section 9.

B.   *The Fourth Amendment*

The remaining question before us is whether the analysis under the Fourth Amendment requires a different result. Although worded somewhat differently, the guarantee of the Fourth Amendment parallels that of Article I, section 9. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" As is true of Article I, section 9, a "seizure" under the Fourth Amendment occurs when there is "some meaningful interference with an individual's possessory interest" in property. *United States v. Jacobsen*, 466 US 109, 113, 104 S Ct 1652, 80 L Ed 2d 85 (1984) (citations omitted). And a "search" for purposes of the Fourth Amendment occurs when an individual's protected privacy interest is infringed. *Id*. (citations omitted).

The test under the Fourth Amendment to determine if a particular governmental action invades a protected privacy interest differs, at least in how it is articulated, from the test under Article I, section 9. Rather than turn on an individual's "right" of privacy, the Fourth Amendment test has both a subjective and an objective component, and thus involves "two discrete questions." *United States v. Knotts*, 460 US 276, 280-81, 103 S Ct 1081, 75 L Ed 2d 55 (1983) (quoting *Smith v. Maryland*, 442 US 735, 99 S Ct 2577, 61 L Ed 2d 220 (1979)), *rule further clarified in U.S. v. Jones*,

___ US ___, 132 S Ct 945, 951-52, 181 L Ed 2d 911 (2012). The first is whether an individual has manifested an expectation to preserve something as private; the second is whether that subjective expectation of privacy is one "that society is prepared to recognize as reasonable." *Knotts*, 460 US at 281 (internal quotations omitted) (citing cases). In application, however, the Fourth Amendment privacy test takes into account the same and similar considerations as the test under Article I, section 9, and the two tests often lead to the same result in like circumstances.[16]

Understandably, then, the parties' Fourth Amendment arguments closely track the arguments they make under Article I, section 9. Ultimately, the issue under the Fourth Amendment reduces to the same question as under Article I, section 9: Whether defendant had a protected privacy interest in the withdrawal and testing of her dog's blood for purposes of medical treatment after the dog had been lawfully taken into custody on probable cause to believe that he had been criminally neglected.[17] To date, the Supreme

---

[16] *Compare, e.g., Arkansas v. Sanders*, 442 US 753, 764 n 13, 99 S Ct 2586, 61 L Ed 2d 235 (1979), *abrogated on other grounds by California v. Acevedo,* 500 US 565, 579, 111 S Ct 1982, 114 L Ed 2d 619 (1991) (not all containers and property deserve full protection of Fourth Amendment; no protected privacy interest in container when its outward appearance reveals contents) *with Owens*, 302 Or at 206 (same under Article I, section 9); *Jacobsen*, 466 US at 125 (removal and testing of white powder from lawfully seized clear vial to confirm probable cause belief that substance was cocaine was not a significant invasion of protected property interest under Fourth Amendment) *with Owens*, 302 Or at 206 (same under Article I, section 9); *Texas v. Brown*, 460 US 730, 740, 103 S Ct 1535, 75 L Ed 2d 502 (1983), *abrogated on other grounds by Horton v. California*, 496 US 128, 110 S Ct 2301, 110 L Ed 2d 112 (1990) (no legitimate expectation of privacy in interior of automobile that may be viewed from outside, even when officer used flashlight to illuminate interior and specially positioned himself to see inside) *with Wacker*, 317 Or at 427 (no protected privacy interest in activity inside car parked at night in lighted parking lot where activity could be viewed by public passing by, even though police observations were made from second floor of adjacent tavern using night vision scope that magnified view and improved night vision).

[17] Defendant also presses an argument under the Fourth Amendment that the the blood tests were a search because they required a physical intrusion into her property and thus violated her possessory interest in her dog. The cases that defendant relies on, however, involved physical invasions of property that the government had not lawfully seized. *Florida v. Jardines*, ___ US ___, 133 S Ct 1409, 185 L Ed 2d 495 (2013) (use of drug-sniffing dog on front porch of private home exceeded implicit invitation to approach home, and therefore amounted to trespassory invasion of curtilage that violated Fourth Amendment); *Jones*, ___ US ___, 132 S Ct 945, 951-53 (covert placement of GPS tracking device on automobile to track vehicle's movements physically trespassed on defendant's property and

Court has not had a case requiring it to examine an individual's privacy interests in a dog or other animal, either generally or in circumstances in which the animal is in the government's lawful custody. But the Court's cases suggest that the analysis under the Fourth Amendment would not differ in a significant way from the analysis we have made under Article I, section 9.

In particular, the different nature of that property that this case involves—a living animal, one that is not ordinarily and was not here used as a repository into which other property was placed—would have bearing on the Fourth Amendment analysis. *See, e.g., Robbins v. California*, 453 US 420, 426, 101 S Ct 2841, 69 L Ed 2d 744 (1981) (placement of property into closed, opaque container manifests "an expectation that the contents would remain free from public examination"); *Arkansas v. Sanders*, 442 US 753, 761, 99 S Ct 2586, 61 L Ed 2d 235 (1979) (automobiles are distinct from closed containers, not only because of their mobility, but also because their use, configuration, and regulation differentiate them for purposes of privacy expectations).[18] The same is true of the nature and circumstances of the government intrusion that we have discussed—those, too, would be factors in the Fourth Amendment analysis.

---

therefore violated Fourth Amendment protection from unreasonable searches). As earlier noted, the lawfulness of Juno's seizure is not an issue at this juncture. Defendant's remaining Fourth Amendment argument proceeds on the assumption that Juno was lawfully seized, which is the posture of the issue before us. For that argument, defendant's position is the same as under Article I, section 9: She analogizes Juno to a closed container in which, because its contents were concealed from view, she had a protected privacy interest that was violated when Dr. Hedge drew Juno's blood and tested it without a warrant.

[18] In two later cases, *California v. Acevedo*, 500 US 565, 111 S Ct 1982, 114 L Ed 2d 619 (1991) and *United States v. Ross*, 456 US 798, 102 S Ct 2157, 72 L Ed 2d 572 (1982), the Court reached dispositions that differed from those in *Robbins* and *Sanders*. In *Robbins* and *Sanders*, the Court determined that the fact that a closed opaque container was seized from a mobile automobile did not alter an individual's reasonable expectation of privacy in the closed container, and a warrant was required to intrude into such a container, despite its lawful seizure. *Robbins*, 453 US at 428-29; *Sanders*, 442 US at 766. In *Ross*, 456 US at 824, and *Acevedo*, 500 US at 580, the Court concluded that the automobile exception to the warrant requirement extends to compartments and closed containers within a lawfully stopped automobile when police have probable cause to believe that they have contraband or evidence inside. Although those cases disapproved of aspects of the reasoning and the dispositions in *Robbins* and *Sanders*, the propositions for which we cite *Robbins* and *Sanders* were not disturbed by those later decisions.

*See Vernonia School Dist. 47J v. Acton*, 515 US 646, 654, 115 S Ct 2386, 132 L Ed 2d 564 (1995) ("What expectations [of privacy] are legitimate varies, of course, with context[.]"); *cf. Maryland v. King*, ___ US ___, 133 S Ct 1958, 1978-79, 186 L Ed 2d 1 (2013) (lawfully arrested individuals have lessened legitimate expectations of privacy, even in own DNA). And the laws and social norms of behavior that we have discussed as they pertain to animal welfare generally, and minimum care in particular, are significant under the Fourth Amendment analysis in determining what expectations of privacy society will recognize as legitimate. *See Vernonia*, 515 US at 654-56 (examining laws and social conventions pertaining to minors in public schools to determine "legitimacy" of subjective privacy expectations of students in public school setting).

In short, the guidance available to us from current Fourth Amendment jurisprudence leads us to the same factors that we have considered in analyzing the issue under Article I, section 9. No purpose would be served by repeating ourselves. For the reasons we have discussed in our analysis under Article I, section 9, we conclude under the Fourth Amendment that defendant had no protected privacy that was violated by the withdrawal and testing of Juno's blood without a warrant.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.