Argued and submitted June 18, affirmed September 25,
petition for review allowed December 12, 2013 (354 Or 597)

**STATE OF OREGON,**
*Plaintiff-Respondent,*

*v.*

**LINDA DIANE FESSENDEN,**
*Defendant-Appellant.*

Douglas County Circuit Court
10CR2252MI; A150065

310 P3d 1163

Elizabeth G. Daily, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Pamela J. Walsh, Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Hadlock, Judge.

HADLOCK, J.

## HADLOCK, J.

Defendant appeals her conviction for second-degree animal neglect, arguing that the trial court erred by denying her motion to suppress evidence related to the warrantless search and seizure of her emaciated horse. The trial court's denial of that motion was premised, in part, on its conclusion that a deputy sheriff's seizure of the horse was justified under the "emergency aid" doctrine, which permits law enforcement officers to enter property without a warrant when they "have an objectively reasonable belief, based on articulable facts, that a warrantless entry is necessary to either render immediate aid to persons, or to assist persons who have suffered, or who are imminently threatened with suffering, serious physical injury or harm." *State v. Baker*, 350 Or 641, 649, 260 P3d 476 (2011) (footnotes omitted). Defendant's appeal presents two questions: (1) whether the emergency aid doctrine ever extends to warrantless searches or seizures that law enforcement officers reasonably believe are necessary to render immediate aid or assistance to animals and (2) if so, whether the deputy's warrantless seizure of the starving horse was lawful in the circumstances presented by this case. As explained below, we conclude that the answer to both of those questions is "yes."

We describe the facts consistently with the trial court's explicit and implicit findings, which the evidence supports. Defendant and her codefendant, Dicke, together owned an "older" horse that they kept on Dicke's property. In August 2010, Deputy Sheriff Bartholomew responded to a call from Dicke's neighbors, the Kemplens, who had reported that the horse was "very skinny."[1] Bartholomew, who works in the Animal Control Unit at the Douglas County Sheriff's Office, has a bachelor's degree in animal science, has graduated from the National Animal Control Academy, and is trained to investigate animal cruelty. He has worked at the Sheriff's Office for 22 years and investigates animal-control issues on a daily basis. Bartholomew has specific expertise in

---

[1] The Kemplens, who raise animals themselves, including horses, testified at the suppression hearing that defendant's horse was severely underweight and had difficulty urinating. Mr. Kemplen testified specifically that he believed that the horse needed immediate medical care.

evaluating the weight of horses using the "Henneke Scoring Method," which he described as a method for determining whether "the animal's okay or if it's emaciated or thin," taking into account the amount of fatty tissue on specific areas of the horse's body. Bartholomew evaluates about 100 to 200 horses, including some older horses, every year.

In responding to the Kemplens' call, Bartholomew drove up a "common driveway" that the Kemplens shared with codefendant Dicke. Bartholomew contacted the Kemplens, who told him that the horse looked bad and had been out loose. Bartholomew went further down the driveway to see if the horse was still loose, but she was not; rather, she was "in a little fenced in area" about 100 feet from Dicke's residence. Bartholomew could see from his car that the horse's "backbone was protruding up way more than it should have," which is a sign of emaciation. The horse was "swaying a little bit" and her neck looked thin. "The withers stood way up as well as the backbone," which Bartholomew explained are "signs of emaciation." Bartholomew could see each of the horse's ribs as well as her tail bones; "you could see every bone protrusion, and there was no fatty tissue in the shoulder area you could see." Bartholomew made all of those observations before he touched the horse. He also saw the horse straining to urinate, "having a hard time." Such difficulty in urination can be "an issue of kidney failure."

Before touching the horse or going onto Dicke's property, Bartholomew gave the horse a Henneke body score of one out of nine on a scale where one represents emaciation, "two is very thin, three is thin" up to "seven, eight and nine" which can represent being "too fat." Bartholomew believed that the horse was suffering from a medical emergency:

> "Yeah, anytime you get a horse this skinny internal organs start shutting down. This literally was the thinnest horse I've seen that was still on its feet. It was, of course, wavering. I was afraid it was going to fall over and not be able to get back up."

If a horse that thin falls down, Bartholomew explained, "a lot of times we can't get them back up and then they end up having to be put down." He explained further:

"[T]he uniqueness is a horse, if it goes down because it's too weak, it sometimes can't get back up and then you have problems with breathing and problems with if they roll they can flip their stomachs.

"* * * * *

"* * * Their stomachs get flipped over their intestines on the inside and so it constricts it off, and the only way to fix that is by surgery, and a horse in that kind of condition wouldn't be able to survive a surgery."

Given the horse's condition, Bartholomew believed that the crime of first-degree animal neglect had been committed. He told a man who lived in a nearby trailer that he was going to take the horse to a veterinarian because he was worried that the horse would fall down and not be able to get back up. Bartholomew then reached over the fence and touched the horse for the first time, again performing the steps to develop a Henneke body score. After that physical evaluation, Bartholomew again gave the horse a score of one, which is "the lowest score [that he had] ever given a horse that was still on its feet."

Bartholomew believed that the horse "was suffering," that its emaciation constituted a serious physical injury, and that the horse "was in immediate danger." Accordingly, Bartholomew contacted volunteers to bring a trailer to the area so he could transport the horse to a veterinarian for evaluation. The volunteers arrived about a half-hour later. As the horse was being loaded into the trailer, Bartholomew spoke with Dicke by telephone and informed her that he was taking the horse because he was worried about its immediate welfare. He said that he would return the horse if the veterinarian found nothing wrong with it. The horse was transported to a veterinary hospital, which took about half an hour. Bartholomew and the volunteers did their best "to get it done as quick as possible."

The horse was still standing when it arrived at the veterinary hospital, but veterinarian Giri, who evaluated the horse, gave it a body score of 0.5. Giri reported that the horse was the skinniest that she had seen. Using a stethoscope, Giri determined that the horse had a "really, really bad" heart murmur, which often is "related to being

starved." Giri also ran blood tests "to make sure there was no organ failure." Bartholomew explained that sometimes, if a horse's organs "have already started to fail there's really no being able to bring the horse back," making it more likely that the horse would "have to be put down."[2] Giri did not end up needing to give the horse an IV or perform any surgery.

Giri told Bartholomew that the horse "was definitely in immediate need of care" and Bartholomew took the horse to "Saving Grace" for water, food, and monitoring. He testified that caring for an emaciated horse involves "a very slow process of feeding it small amounts and gradually * * * getting the amounts up to a normal size." The next day, Bartholomew took the horse to a rehabilitation center run by Strawberry Mountain Mustang Rescue to see if the director of that organization, Clark, "could bring it back." A month later, Clark reported, the horse had gained about 100 pounds. Clark had provided the horse "with a simple, normal diet for older horses." By the end of the year, the horse's heart murmur had disappeared.

Defendant called Bartholomew the day after he took the horse and informed him that the horse belonged to her as well as to Dicke. Bartholomew and defendant met the next day; at that time, she was "very emotionally upset about the condition of the horse."

Defendant was charged with second-degree animal neglect under ORS 167.325.[3] She later moved to suppress evidence derived from Bartholomew's search and seizure of the horse, including "any examination of the horse, photographs, body condition score, other observations of and statements about the condition of the horse," as well as her own statements about the horse's condition. Defendant argued that the warrantless search and seizure had violated Article I, section 9, of the Oregon Constitution,[4] and she specifically

---

[2] At trial, Giri testified that the results of the blood tests were normal.

[3] Codefendant Dicke, on whose property the horse was kept, was convicted of first-degree animal neglect and first-degree animal abuse. We also decide her appeal today. *State v. Dicke*, 258 Or App 678, 310 P3d 1170 (2013).

[4] Article I, section 9, of the Oregon Constitution provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation,

contended that neither the emergency aid doctrine nor any other exigency justified Bartholomew's conduct.[5]

Bartholomew explained at the suppression hearing why he had not applied for and obtained a search warrant before he seized the horse. As noted above, Bartholomew had given this horse a body score of one—the lowest score that he would ever give. He testified that he usually starts "getting real nervous" about animals that have a body score of two or three; in those cases, he usually will give the animals' owners suggestions about how to feed the animals to help them gain weight, or he might ask a veterinarian to do so. It is "rare" for Bartholomew to seize an animal without first taking such other steps. Although he investigates animal-related cases daily, Bartholomew will "seize the animal right away" at most only two to three times a year.

In this case, Bartholomew seized the horse without first applying for a warrant because he "was afraid [the horse] was going to go down" and that taking the time to get a warrant "would have presented a danger to [the horse's] life." Based on his personal experience, Bartholomew testified that the process of preparing a search warrant and affidavit for submission to a judge—including drafting the documents and having them reviewed by detectives, a supervisor, and someone at the District Attorney's Office—can take anywhere from four to eight hours. Although Bartholomew has never used a telephone warrant, he testified that he still would have to "go through all the steps" over the telephone, and believes that the process would still take a few hours. He did not apply for a warrant in this case because he "didn't think [the horse] had the time for [him] to go do it."

The trial court denied defendant's suppression motion. First, in a ruling that defendant does not challenge

---

and particularly describing the place to be searched, and the person or thing to be seized."

Defendant cited both the Oregon Constitution and the Fourth Amendment to the United States Constitution in her motion to suppress, but she does not make a federal constitutional argument on appeal.

[5] Defendant and Dicke each adopted the arguments that the other made in association with their suppression motions; accordingly, we attribute all of the arguments made in the circuit court to defendant, for purposes of preservation.

on appeal, the court determined that Bartholomew was at "a lawful vantage point"—*i.e.*, that he was entitled to be on the driveway that Dicke shared with the Kemplens—when he first saw the horse. The trial court then determined that the requirements of the emergency aid doctrine were satisfied and that the horse's condition justified the warrantless search and seizure. Finally, in an alternative ruling, the trial court concluded that the search and seizure were justified by probable cause and exigent circumstances. After the court denied defendant's suppression motion, a jury convicted her of second-degree animal neglect.

On appeal, defendant assigns error to the trial court's denial of her suppression motion, challenging both its "emergency aid" and its "exigent circumstances" rulings. Defendant argues that neither of those exceptions to the Article I, section 9, warrant requirement applies in this case because "a danger to an animal's life is not the kind of emergency that is necessary to diminish constitutional provisions." Alternatively, she contends that, even if those exceptions theoretically can apply to protection of animal life, the state failed to show that an emergency or exigency existed in this case.

We begin by addressing the trial court's ruling on the applicability of the emergency aid exception to the warrant requirement. Defendant argues that the trial court erred by failing to recognize that the exception applies only where human life is threatened. In that regard, she notes that *Baker* describes the exception as applying when an officer reasonably believes that a warrantless entry is necessary to render aid to "persons." 350 Or at 649. Defendant also asserts that animals have a "lower status" than humans, even in modern society, as they lawfully can be owned, hunted, and slaughtered, at least under certain conditions. Consequently, she argues, "this court should not extend the emergency aid exception to situations where an animal rather than a human requires life-saving assistance."

The state counters that *Baker* did not present the question of whether the emergency aid exception can apply

to protection of animals, so its reference to "persons" should not be interpreted as a limitation on that doctrine. In arguing that the exception applies here, the state urges us to consider Oregon's "strong legislative and societal interest in protecting serious injury and harm to animals." As reflections of that interest, the state points to Oregon's animal-neglect statutes and to *State v. Nix*, 251 Or App 449, 283 P3d 442 (2012), *rev allowed*, 353 Or 410 (2013), in which this court held that each animal identified in a count of animal neglect is a victim of that crime for purposes of ORS 161.067(2), which specifies when "there are as many separately punishable offenses as there are victims." Asserting that Oregon's emergency aid exception is founded on Fourth Amendment doctrine, the state also cites cases from other jurisdictions holding that the federal emergency aid doctrine justified warrantless searches that were necessary to protect animal life. The state concludes that the strong societal interest in animal protection "should justify emergency aid to suffering animals under Article I, section 9."

We agree with the state. We start from the premise that warrantless searches and seizures are *per se* unreasonable under Article I, section 9, unless they fall within one of the few established exceptions to the warrant requirement. *Baker*, 350 Or at 647. We also acknowledge that the Supreme Court has described the emergency aid exception in terms that apply to human beings and not, expressly, to other animals. *Id.* at 649 (the "emergency aid exception to the Article I, section 9, warrant requirement is justified when police officers have an objectively reasonable belief, based on articulable facts, that a warrantless entry is necessary to either render immediate aid *to persons*, or to assist *persons* who have suffered, or who are imminently threatened with suffering, serious physical injury or harm" (footnotes omitted; emphases added)). But the court's description of the exception in human terms is understandable, perhaps inevitable, given that the few emergency aid cases it has addressed all have turned on perceived threats to human safety. The court simply has not been presented with the question of whether the exception extends to the protection of animals, and its description of the doctrine cannot fairly be said to have rejected that contention.

Accordingly, the task falls to us to determine the boundaries of the emergency aid exception in relation to the protection of nonhuman animals. In that regard, "reasonableness" is the ultimate touchstone of our inquiry, as it has been when courts have considered the boundaries of the other established exceptions to the warrant requirement. *Cf. State v. Fair*, 353 Or 588, 602, 302 P3d 417 (2013) (the "touchstone" of the state and federal constitutional limitations on searches and seizures is "reasonableness"). For example, the Supreme Court has described the officer safety exception as allowing an officer to take "reasonable precautions to protect the safety of the officer or others" if the officer has reasonable suspicion "that there exists an immediate threat of serious physical injury to the officer or others present." *State v. Guggenmos*, 350 Or 243, 251, 253 P3d 1042 (2011). Those "reasonable precautions" may, depending on the circumstances, include conducting limited warrantless searches. *State ex rel Juv. Dept. v. M. A. D.*, 348 Or 381, 392-93, 233 P3d 437 (2010). Similarly, school officials who "perceive there to be an immediate threat to student or staff safety at a school" may take "reasonable" protective actions. *Id.* at 394.

Thus, the question here reduces to whether it ever can be reasonable for officers to conduct warrantless searches or seizures for the purpose of aiding *animals* that "have suffered, or [that] are imminently threatened with suffering, serious physical injury or harm." *Baker*, 350 Or at 649. Our consideration of that question is informed by the societal interest that the exception aims to protect, just as the "societal interest" in "the need to immediately render aid to a person or to prevent the immediate threat of serious personal injury or harm" informed the Supreme Court's general description of the emergency aid doctrine in *Baker*. *Id.* With respect to animal life, the contours of the societal interest are reflected in the various Oregon statutes that relate to animal welfare. Several statutes affirm the circumstances in which it is lawful to kill or physically alter an animal. *See, e.g.*, ORS 167.335; ORS 167.310(4) (unless gross negligence is involved, the animal-neglect and animal-abuse statutes do not apply to, among other circumstances, certain "killing of livestock," "[l]awful fishing, hunting and trapping activities," and "good animal husbandry practices,"

including dehorning and castration). Nonetheless, the legislature has mandated that—except in those specifically authorized circumstances—it is a crime to kill an animal "[c]ruelly." ORS 167.320(1)(b) (defining first-degree animal abuse). And even when certain types of killing are exempted from the animal-abuse and animal-neglect statutes, the legislature at least sometimes has separately provided that the killing must minimize pain. *See, e.g.*, ORS 603.065(1)(a) (cattle, equine, sheep, and swine may be slaughtered by any method that "[r]enders each such animal insensible to pain" by a method "that is rapid and effective").

Other statutes similarly reflect a legislative focus on the prevention of unnecessary cruelty to animals. The animal-abuse statutes seek to protect animals from "physical injury," defined to include "physical trauma" and "substantial pain," ORS 167.310(8), ORS 167.315(1), as well as "serious physical injury," which includes "physical injury that creates a substantial risk of death or that causes * * * protracted impairment of health." ORS 163.210(11); ORS 163.320(1)(a); *see Nix*, 251 Or App at 456 ("[T]he legislature intended to protect animals by creating the crime of second-degree animal abuse."). Animal abuse is aggravated if, among other things, it involves intentionally or knowingly torturing an animal, where "torture" is defined as "an action taken for the primary purpose of inflicting pain." ORS 167.322(1)(b), (3)(b). And the animal-neglect statutes seek to ensure that animals are provided with "minimum care," *i.e.*, the care sufficient to preserve their "health and well-being." ORS 167.310(7); ORS 167.325(1); ORS 167.330(1). All of those statutes reflect a legislative concern that animals be protected from unnecessary pain, trauma, and suffering, even when they are killed in an otherwise lawful manner. *Cf. Nix*, 251 Or App at 461 ("the legislature's primary concern" in enacting animal-neglect statute "was to protect individual animals as sentient beings").

Of course, the legislature cannot dictate which law enforcement actions comport with constitutional requirements and which do not. But legislative enactments and the policies reflected in them are at least relevant as we consider the boundaries of the judicially established exceptions to the

warrant requirement, and we find them helpful in this context. *Cf. Fair*, 353 Or 588 at 611 n 13 (explaining that "the general reasonableness" of officers' inquiries of people whom officers suspect are victims of domestic violence "is bolstered by the special duties that the legislature has placed on officers responding to incidents of domestic abuse"); *id.* at 606 (citing model-code provisions regarding the lawfulness of certain types of police conduct, in association with determining when a warrantless seizure of a person is reasonable under Article I, section 9). We therefore consider the statutes cited above, along with our understanding of the principles on which *Baker* and other emergency-aid exception cases are based, in determining whether that exception ever extends to providing emergency aid to nonhuman animals.

We conclude that it does. That is, the societal interest in protecting nonhuman animals from unnecessary pain, injury, trauma, and cruel death can justify—at least in some circumstances—a warrantless search or seizure aimed at preventing or alleviating that suffering. Mirroring *Baker's* description of the emergency aid exception as closely as possible, given the permissibility of killing and physically altering animals in some contexts, we hold that a warrantless search or seizure is justified when law enforcement officers have an objectively reasonable belief, based on articulable facts, that the search or seizure is necessary to render immediate aid or assistance to animals that have suffered, or which are imminently threatened with suffering, serious physical injury or cruel death, unless that injury or death is being inflicted lawfully.

We do not pretend to describe, in this opinion, the universe of circumstances in which the officer's belief that a warrantless search or seizure is necessary will be deemed reasonable. Even with respect to the imminent death of an animal, the reasonableness of an officer's belief and actions will have to be determined on a case-specific basis, taking into account the totality of the circumstances, including the species of animal involved. To resolve this case, we need conclude only that an officer who reasonably believes that a horse is near death from starvation, is in imminent danger of suffering organ damage (either directly from starvation

or as the result of falling), and needs emergency medical care acts reasonably in entering a pasture and seizing the horse without waiting several hours to obtain a search warrant. We so hold.

The question remains whether that principle justifies Bartholomew's warrantless search and seizure in this case. We conclude that it does. Even from the common driveway, Bartholomew, who had evaluated thousands of horses in his career, could see that this horse was more emaciated than any other horse he had ever seen that still was able to stand. Moreover, the horse was swaying and unsteady, and Bartholomew was concerned that she might fall, which could have been fatal for a horse in her condition. In addition, he saw signs of possible organ failure. Given his training and experience, Bartholomew reasonably could—and did—conclude from those pre-search observations that the horse needed emergency medical care. Given the possibility of imminent death, as well as the unnecessary suffering associated with starvation and organ failure (including, as Bartholomew explained, possible intestinal constriction if the horse fell), Bartholomew also could reasonably conclude that he should take immediate steps to save the horse, or at least alleviate its suffering, without waiting to obtain a search warrant.

In arguing to the contrary, defendant contends that, if Bartholomew believed that the horse was in imminent danger of starving, he should have fed her instead of removing her from Dicke's property. In addition, defendant asserts, the state did not identify any medical care that could have improved the horse's condition even if she were suffering organ failure. Because Bartholomew could not identify any potentially helpful veterinary intervention other than feeding, defendant concludes, he was not justified in seizing the horse without a warrant so he could transport her to the veterinary hospital. We disagree. First, Bartholomew testified that caring for an emaciated horse involves a "very slow" feeding process with small amounts that gradually increase over time. Nothing in the record suggests that simply providing the horse with a meal would

have alleviated the emergency.[6] Second, Bartholomew's inability to specify particular medical procedures that might have immediately improved the horse's condition does not undercut the reasonableness of his determination that the horse should be taken to a veterinarian, who presumably would be more qualified to determine how the horse might be helped. Moreover, even if it turned out that the horse had suffered organ failure and no curative medical intervention was available, the advisability of euthanasia—a procedure meant to cut short unnecessary suffering—itself would sufficiently justify Bartholomew's actions in this case. In short, Bartholomew's belief that immediate action was necessary to alleviate the horse's suffering and possibly save it from the risk of imminent death was reasonable under the circumstances. It follows that the trial court did not err when it denied defendant's motion to suppress.

Affirmed.

---

[6] The director of Strawberry Mountain Mustangs elaborated at trial that she follows a very careful "refeeding regimen" developed at a university where people have "done a lot of research on how to refeed starved animals." She explained that starving horses that are given the wrong food, or too much of it, can suffer organ failure and death.