Argued and submitted September 2, 2020, affirmed August 31, 2022

JUSTICE,
an American Quarter Horse,
by and through his Guardian,
Kim Mosiman,
*Plaintiff-Appellant,*

*v.*

Gwendolyn VERCHER,
*Defendant-Respondent.*

Washington County Circuit Court
18CV17601; A169933

518 P3d 131

In this case of first impression, Kim Mosiman, Executive Director of Sound Equine Options, filed a complaint naming a horse (Justice) as plaintiff, alleging Mosiman's legal authority to act as the horse's guardian, and claiming negligence against the horse's former owner, defendant Vercher. The trial court concluded that the named plaintiff lacks legal capacity to sue and dismissed the complaint. On appeal, Mosiman challenges the trial court's ruling on the motion to dismiss. *Held*: Under Oregon common law, only human beings and legislatively created legal entities are persons with the capacity to sue. The named plaintiff is neither a human being nor a legal entity and therefore lacks capacity to sue to vindicate ostensible rights in an Oregon court. The trial court did not err when it dismissed the complaint with prejudice.

Affirmed.

John S. Knowles, Judge pro tempore.

Matthew Liebman, Animal Legal Defense Fund, argued the cause and filed the briefs for appellant. Also on the briefs were Christopher A. Berry, Animal Legal Defense Fund; Margaret H. Leek Leiberan, Jensen and Leiberan; Matthew Hamity, Law Office of Matthew Hamity; and Sarah Hanneken.

Geordie Duckler argued the cause for respondent. Also on the brief was Geordie Duckler, P.C.

Lindsey Stallings and Conway Law filed the brief *amicus curiae* for Animal Law Professors.

Richard L. Cupp, Jr., filed the brief *amicus curiae pro se*.

Julia E. Markley, Sasha A. Petrova, and Perkins Coie LLP filed the brief *amici curiae* for Robin L. Foster, Ph.D., CAAB, CHBC; Antonia J. Z. Henderson, Ph.D.; Tammy M. Donaldson, MS, Ph.D., CAAB; Nina Ekholm Fry, MSSC; Shawna Karrasch; Katherine Houpt, VMD, Ph.D., DACVB; Sharon Madere, CHBC; and Andrew McLean, Ph.D.

Samantha J. Bayer and Mary Anne Cooper; and T. Beau Ellis and Vial Fotheringham LLP, filed the brief *amici curiae* for Oregon Farm Bureau Federation; and Oregon Cattlemen's Association and Oregon Dairy Farmers Association.

Before Ortega, Presiding Judge, and Shorr, Judge, and Powers, Judge.

ORTEGA, P. J.

Affirmed.

**ORTEGA, P. J.**

As a matter of first impression, this case requires us to determine whether a horse has the legal capacity to sue in an Oregon court. Kim Mosiman, Executive Director of Sound Equine Options (SEO), filed a complaint naming a horse, Justice, as plaintiff, alleging Mosiman's legal authority to act as his guardian, and claiming negligence against his former owner, defendant Vercher.[1] In this appeal, Mosiman challenges the trial court's grant of defendant's motion to dismiss. We conclude that only human beings and legislatively created legal entities are persons with the capacity to sue under Oregon common law. Justice, a horse, is neither a human being nor a legal entity and therefore lacks capacity to sue to vindicate ostensible rights in an Oregon court. Accordingly, we affirm the trial court's judgment dismissing the complaint with prejudice.

In reviewing a motion to dismiss, "we recite the material facts as alleged in the complaint, drawing any reasonable inferences in the light most favorable to plaintiff, and review the trial court's decision for legal error." *Greenleaf Auto Repair v. Ideal Auto Works*, 318 Or App 865, 866, 509 P3d 750 (2022).

In March 2017, defendant's neighbor contacted Oregon Horse Rescue to report concerns that defendant's horse, who defendant called Shadow but has since been renamed Justice, was underfed and emaciated. The neighbor persuaded defendant to seek veterinary care for her horse. The veterinarian who examined him concluded that he was emaciated and would need to be either housed in a stall or rehomed. Defendant voluntarily surrendered custody of her horse to SEO, and Mosiman transported him to an equine hospital for urgent care.

Justice was 300 pounds underweight, lethargic, weak, and had significant difficulty walking. His condition

---

[1] Although Justice is the named party-plaintiff in this matter, we refer to the arguments presented on his behalf as made by Mosiman with the assistance of counsel. As we will explain further below, 321 Or App at 444-48, we doubt Mosiman's legal authority to act on behalf of the named plaintiff. However, defendant does not challenge Mosiman's authority to bring this appeal, and we are satisfied that the trial court had jurisdiction to enter the judgment and that we have jurisdiction to decide the appeal.

and course of recovery suggest that he had been malnourished for several months. He was placed on a refeeding protocol and treated for lice, rain rot, and a penile infection caused by prolapse and frostbite. Over the next several months in Mosiman's care, his physical condition improved, but he continued to exhibit behavioral distress. His penis remains prolapsed and will likely require partial amputation. As a result of his injuries, Justice will require special and costly care that he otherwise would not need, including unique sheltering needs, medications, and socialization training. The additional costs involved in caring for him will make finding a permanent home for him more difficult.

In July 2017, defendant pleaded guilty to first-degree animal neglect, ORS 167.330.[2] Pursuant to her plea agreement, defendant agreed to pay restitution to SEO for the costs of Justice's care prior to July 6, 2017.[3]

In August 2017, Mosiman created the Justice Equine Trust to provide for Justice's care for the remainder of his life. *See* ORS 130.185 (authorizing a settlor to create a trust to provide for the care of an animal that is enforced by a person appointed by the terms of the trust or by the court). Justice continues to reside at SEO's training barn, and Mosiman remains responsible for his care.[4]

In May 2018, Mosiman filed a complaint that named "Justice, an American Quarter Horse," as plaintiff

---

[2] ORS 167.330 provides, in relevant part:

"(1) A person commits the crime of animal neglect in the first degree if, except as otherwise authorized by law, the person intentionally, knowingly, recklessly or with criminal negligence:

"(a) Fails to provide minimum care for an animal in the person's custody or control and the failure to provide care results in serious physical injury or death to the animal."

[3] At the time defendant was sentenced, the trial court was authorized to require defendant to "forfeit any rights of the defendant in the animal subjected to the violation, and to repay the reasonable costs incurred by any person or agency prior to judgment in caring for each animal subjected to the violation." ORS 167.350(1) (2017), *amended by* Or Laws 2017, ch 677, § 4. The trial court was also authorized to "order the owner or person having custody of an animal to repay the reasonable costs incurred by any person or agency in providing minimum care to the animal." ORS 167.350(3) (2017), *amended by* Or Laws 2017, ch 677, § 4.

[4] The complaint does not say whether SEO or Mosiman is Justice's current owner.

and contained a single claim of relief for negligence *per se*. Tracking the elements of negligence *per se*, the complaint alleged that defendant violated ORS 167.330(1) by failing to provide minimum care[5] for Justice, that he was injured as a result of that violation, that he is a member of the "class of persons" that ORS 167.330 was enacted to protect, and that his injuries are the type that ORS 167.330 was enacted to prevent. *See Scheffel v. Oregon Beta Chapter of Phi Kappa Psi*, 273 Or App 390, 415, 359 P3d 436 (2015) (setting out elements of negligence *per se*). The complaint sought economic damages for costs of past and future care for Justice after July 6, 2017, along with noneconomic damages for his pain and suffering and reasonable attorney fees.

Defendant moved to dismiss the complaint on the grounds that a horse lacks legal capacity to sue, *former* ORCP 21 A(4) (2018), *renumbered as* ORCP 21 A(1)(d) (2022), and that the complaint failed to state a claim, *former* ORCP 21 A(8) (2018), *renumbered as* ORCP 21 A(1)(h) (2022). Defendant argued that Justice is an animal and not a person or legal entity who may pursue a cause of action in court at all, let alone state a claim for negligence *per se*.

The trial court granted defendant's motion to dismiss with prejudice. In a written opinion, the court concluded that "a non-human animal such as Justice lacks the legal status or qualifications necessary for the assertion of legal rights and duties in a court of law" and observed that "[t]here are profound implications of a judicial finding that a horse, or any non-human animal for that matter, is a legal entity that has the right to assert a claim in a court of law." The court posited that an appellate court could come to a different conclusion if it "wades into this public policy debate involving the evolution of animal rights," or the legislature

---

[5] ORS 167.310(9) defines "minimum care," in relevant part, as "care sufficient to preserve the health and well-being of an animal and, except for emergencies or circumstances beyond the reasonable control of the owner, includes, but is not limited to, the following requirements:

"(a) Food of sufficient quantity and quality to allow for normal growth or maintenance of body weight.

"* * * * *

"(d) Veterinary care deemed necessary by a reasonably prudent person to relieve distress from injury, neglect or disease."

could "balance the public policy implications of the relief sought by Justice and craft legislation that would grant an animal the right to sue in its name for specified damages in specific circumstances." The trial court, however, was "unable to take that leap."

On appeal, Mosiman continues to assert legal authority to act on behalf of the named plaintiff and asks this court to hold that he is a juridical person who may bring a common-law tort claim to recover economic and non-economic damages. Mosiman contends that granting her request is within our power to modify the common law and is compelled by Oregon law, which, in her view, recognizes the substantive legal right of certain animals to be free from abuse and neglect, and the procedural legal right of those animals who have been abused or neglected to sue their offender as crime victims. Mosiman further contends that such a holding would be limited, because it would apply only to those animals who must be afforded minimum care under Oregon's animal welfare statutes, ORS 167.305 to 167.390.

We first address Mosiman's authority to sue on behalf of the named plaintiff in this case. The complaint alleges that Mosiman is acting on behalf of Justice as his "guardian" because she is "the person responsible for Justice's care and well-being" and that she therefore represents his interests in this case pursuant to ORCP 27 A.[6] Defendant contested Mosiman's status as a horse's guardian and the applicability of ORCP 27, but not as a basis for her motion to dismiss. Rather, defendant raised the issue in support of her request for attorney fees upon prevailing on the motion to dismiss. *See* ORS 20.105 (requiring a trial court to award reasonable attorney fees to a prevailing party upon a finding that there was no objectively reasonable basis for asserting the claim, defense, or ground for appeal against the party).

In response, Mosiman conceded that, as a horse, Justice lacks the legal capacity to sue independently, but

---

[6] ORCP 27 A provides, in relevant part: "In any action, a party who has a guardian *** shall appear in that action *** through their guardian[.]" Although that rule has been amended since the proceedings in the trial court, the amendments do not affect our analysis and we cite to the current version throughout this opinion.

argued that she is his *de facto* guardian[7] and that, had the trial court disagreed, it could have appointed Mosiman as his guardian *ad litem* or fashioned another procedure for appointing Mosiman to represent his interests in this case.

The trial court concluded that there was "no objectively reasonable basis for naming *** Mosiman as the [g]uardian of Justice in this matter" and imposed attorney fees on that basis. Mosiman does not assign error to that ruling on appeal, and defendant does not ask us to affirm the trial court's ruling on the motion to dismiss on the alternative basis that Mosiman lacks capacity to sue on behalf of the named plaintiff. In Mosiman's view, the guardianship issue is "a red herring not properly at issue in this appeal and, if necessary, should be handled only on remand."

It is true that Mosiman's apparent lack of capacity to sue on the named plaintiff's behalf is not an impediment to reaching the merits of the trial court's ruling on the motion to dismiss. *See Bobell v. Wagenaar*, 106 Or 232, 236, 210 P 711 (1922) (a presumed incapacitated party's appearance without a duly appointed guardian does not deprive a court of jurisdiction); *see also Christman v. Scott*, 183 Or 113, 117-18, 191 P2d 389 (1948) (a plaintiff need not allege (1) that a guardian is "duly appointed" or (2) facts regarding appointment; a defendant bears the burden of objecting to any defect in the appointment of a plaintiff's guardian). And we generally will not consider an alternative basis to affirm when a party has not asked us to do so. *State v. Shields*, 309 Or App 516, 526-27, 482 P3d 784 (2021).

However, we disagree that the issue is wholly irrelevant to the question before this court. As the Ninth Circuit has observed, "It is obvious that an animal cannot function as a plaintiff in the same manner as a juridically competent human being." *Cetacean Community v. Bush*, 386 F3d 1169, 1176 (9th Cir 2004). Yet a procedural mechanism does not appear to exist under Oregon law for a person to sue on behalf of an animal. ORCP 27 applies to a "party," a term used elsewhere in the ORCPs to refer to natural or artificial persons. *Dahlton v. Kyser*, 370 Or 34, 41-47, 513 P3d 598

---

[7] Mosiman cited no authority under Oregon law, and we are aware of none, for a person to legally act on behalf of another as a *de facto* guardian.

(2022) (holding that the term "party" in ORCP 44 is used in the technical sense defined in *Black's Law Dictionary* as "the party plaintiff or defendant, whether composed of one or more individuals, and whether natural or legal persons"). Even if the legislature intended a "party" in ORCP 27 to include an animal, which is doubtful, there is no statutory authority for a court to appoint a guardian for an animal. *See, e.g.*, ORS chapter 125 (providing for protective proceedings, including guardianships, for adult, vulnerable youth, and minor persons).

It is also doubtful that a court could exercise discretion, on its own motion, to appoint a guardian *ad litem* to act on behalf of an animal in a legal action. ORCP 27 A defines guardian *ad litem* as "a competent adult who acts in the party's interests in and for the purposes of the action," which, in this context, begs the question: What are the interests of an animal in a negligence action, or any action at law? An animal such as a horse inherently lacks self-determination and the ability to express its wishes in a manner that the legal system would recognize. That incapacity exists in perpetuity such that it would be difficult to say that a court—or any human being—may actually discern the animal's own interests in pursuing a legal action. A person purporting to represent the interest of an animal in court necessarily projects an assumed interest onto the animal and therefore acts upon a legal fiction. That then raises the question: Who is the appropriate agent to make an assumption on behalf of an animal, to create that legal fiction? Because of an animal's distinctive incapacity, analogies to persons with legal disabilities (such as unemancipated minors, incapacitated or financially incapable persons, or persons with a cognitive disability) do not adequately shed light on the correct answer to that question.

The Ninth Circuit articulated similar concerns in a case where an animal rights organization, People for the Ethical Treatment of Animals (PETA), sued on behalf of a monkey named Naruto for copyright infringement in federal court. *Naruto v. Slater*, 888 F3d 418 (9th Cir 2018). In *Naruto*, PETA asserted "next friend" status under FRCP 17(c) to bring claims on behalf of the monkey. *Id.* at 420. FRCP 17(c) does not require a court to appoint a next friend;

rather, a putative next friend must show that the next friend "has some significant relationship with, and is truly dedicated to the best interests of," the named plaintiff. *Id.* at 421. The court "gravely doubt[ed]" that PETA could validly assert next-friend status to represent claims made for Naruto, both because PETA "failed to allege any facts to establish the required significant relationship between a next friend and a real party in interest" and because "an animal cannot be represented by a next friend" under federal law. *Id.* PETA did not claim to have a relationship with Naruto any more significant than its relationship with any other animal. *Id.* And, following guidance in *Lenhard v. Wolff*, 443 US 1306, 1312, 100 S Ct 3, 61 L Ed 2d 885 (1979), about "the dangers inherent in any third-party standing doctrine," the court declined to expand next-friend standing beyond the text of FRCP 17(c), which authorizes next-friend lawsuits on behalf of a "minor or incompetent person," but not on behalf of animals. *Naruto*, 888 F3d at 422.

        The concurrence emphasized that next-friend standing should be narrowly tailored in light of public policy concerns associated with expanding the doctrine because, "however worthy and high minded the motives of 'next friends' may be, they inevitably run the risk of making the actual [party] a pawn to be manipulated on a chessboard larger than his own case." *Id.* at 431 (Smith, J., concurring) (quoting *Lenhard*, 443 US at 1312). In the concurrence's view:

> "Animal-next-friend standing is particularly susceptible to abuse. Allowing next-friend standing on behalf of animals allows lawyers (as in *Cetacean*) and various interest groups (as here) to bring suit on behalf of those animals or objects *with no means or manner to ensure the animals' interests are truly being expressed or advanced*. Such a change would fundamentally alter the litigation landscape. Institutional actors could simply claim some form of relationship to the animal or object to obtain standing and use it to advance their own institutional goals with no means to curtail those actions. We have no idea whether animals or objects wish to own copyrights or open bank accounts to hold their royalties from sales of pictures. To some extent, as humans, we have a general understanding of the similar interests of other humans. In the habeas

corpus context, we presume other humans desire liberty. Similarly, in actions on behalf of infants, for example, we presume the infant would want to retain ownership of the property she inherited. But the interests of animals? We are really asking what *another species* desires. Do animals want to own property, such as copyrights? Are animals willing to assume the duties associated with the rights PETA seems to be advancing on their behalf? Animal-next-friend standing is materially different from a competent person representing an incompetent person. We have millennia of experience understanding the interests and desire of humankind. This is not necessarily true for animals. Because the 'real party in interest' can *never credibly articulate its interests or goals*, next-friend standing for animals is left at the mercy of the institutional actor to advance its own interests, which it *imputes* to the animal or object with *no accountability*. This literally creates an avenue for what Chief Justice Rehnquist feared: making the actual party in interest 'a pawn to be manipulated on a chessboard larger than his own case.'"

*Id.* at 432 (Smith, J., concurring) (quoting *Lenhard*, 443 US at 1312 (emphases in original; footnotes omitted)).

Thus, that a trial court could simply fashion a procedure to appoint Mosiman to represent Justice's interests in this case—or a human to represent such an animal in any case—is not as simple as Mosiman suggests. Mosiman and SEO may not be alone in claiming an interest in the welfare of the named plaintiff. And while it is reasonable to presume that a horse like Justice—or any animal that is dependent on a human to meet its basic needs—wants to be afforded minimum care, it does not necessarily follow that a neglected horse would want to achieve that goal by suing his former owner for damages in tort.[8] Indeed, the concerns the *Naruto* court expressed regarding next-friend standing for an animal would be present in any *ad hoc* procedure that a court attempted to fashion without legislative guidance such as that found in ORCP 27.

We turn to the question of whether an animal is or may be a legal person with the capacity to hold and assert

---

[8] The possibility that the named plaintiff's lack of self-determination may be wielded to particular human or institutional goals is apparent in the choice to rename him Justice.

individual rights under Oregon common law. We begin with the pertinent legal background.

Under the English common law, only human beings and legal entities created by human beings were considered "persons" capable of holding and asserting legal rights. In the first chapter ("Of the Absolute Rights of Individuals") of the first book ("Of the Rights of Persons") of his Commentaries, William Blackstone defined persons as follows:

> "Persons also are divided by the law into either natural persons, or artificial. Natural persons are such as the God of nature formed us; artificial are such as are created and devised by human laws for the purposes of society and government, which are called corporations or bodies politic."

William Blackstone, 1 *Commentaries on the Laws of England* 123 (1771). Blackstone observed that "rights" are "commanded *** by the laws" and fall into one of two categories: "rights of persons" ("those which concern and are annexed to the persons of men") and "rights of things" ("such as a man may acquire over external objects, or things unconnected with his person"). *Id.* at 122. Rights of persons were further categorized under the English common law as either "absolute" or "relative." *Id.* at 123. Absolute rights were those that "appertain and belong to particular men, merely as individuals or single persons," "such as would belong to their persons merely in a state of nature, and which every man is intitled to enjoy, whether out of society or in it." *Id.* Relative rights were those "incident to [men] as members of society, and standing in various relations to each other." *Id.* Blackstone described infringements of personal rights as "private wrongs" or "civil injuries" with corresponding "means of redressing them by law" through bringing suit in court. *Id.* at 122.

In accordance with that understanding of persons and rights under the English common law, it has long been the rule that only a natural or artificial person may bring a legal action to redress violation of rights. William M. McKinney, 15 *Encyclopedia of Pleading and Practice under the Codes and Practice Acts, at Common Law, in Equity and in Criminal Cases* 467-68 (1895-1902) ("As a general rule, all persons, whether natural or artificial, *sui juris* or otherwise,

are entitled to sue, and conversely are liable to be sued.”); *Parties*, 67A CJS § 1 (2022) (“The word ‘party,’ with reference to judicial proceedings, is generally used as meaning one of two opposing litigants, the plaintiff or the defendant; but in a larger legal sense, the term ‘parties’ means all persons who have a right to control the proceedings, to make defense, to adduce and cross-examine witnesses, and to appeal from the decision if an appeal lies.”); *Parties*, 59 Am Jur 2d § 1 (2022) (“By its very terms, an action at law implies the existence of legal parties. Such an action requires a person or entity that has the right to bring the action and a person or entity against which the action can be maintained.”); *cf. Dahlton*, 370 Or at 44 (“Throughout ORCP 44, ‘party’ means a person with the authority to control the litigation.”).

Under Oregon law, a person with the right to sue to redress a violation of rights is and always has been a human being or an entity created by human law. That understanding is reflected in dictionary definitions of ordinary and legal usage. *See, e.g.*, *Webster’s Third New Int’l Dictionary* 1686 (unabridged ed 2002) (defining “person” as “an individual human being,” “a human being as distinguished from an animal or thing,” and “a human being, a body of persons, or a corporation, partnership, or other legal entity that is recognized by law as the subject of rights and duties”); Noah Webster, 2 *An American Dictionary of the English Language* (unpaginated) (1828) (defining “person” as “[a]n individual human being consisting of body and soul,” “[a] man, woman, or child, considered as opposed to things, or distinct from them,” and “[i]n law, an artificial person is a corporation or body politic”); *Black’s Law Dictionary* 1378-79 (11th ed 2019) (defining “person” as “[a] human being” and “artificial person” as “[a]n entity, such as a corporation, created by law and given certain legal rights and duties of a human being”); *Black’s Law Dictionary* 892 (1st ed 1891) (defining “person” as “[a] human being considered as capable of having rights and of being charged with duties; while a ‘thing’ is the object over which rights may be exercised” and citing to Blackstone’s definition of natural and artificial persons). The Oregon Criminal Code also reflects that understanding of a person as a human being or legal entity. ORS 161.015 (for purposes of the Oregon Criminal Code “person” means

"a human being and, where appropriate, a public or private corporation, an unincorporated association, a partnership, a government or a governmental instrumentality"); *former* ORS 161.010(11), *repealed by* Or Laws 1971, ch 743, § 432 (as used in statutes relating to crimes and criminal procedure "person" "includes corporations as well as natural persons" and where it is "used to designate the party whose property may be the subject of a crime, it includes this state, any other state, government or country which may lawfully own any property in this state, and all municipal, public, or private corporations, as well as individuals"); General Laws of Oregon, Crim Code, ch LIII, § 724, p 577 (Deady 1845-1864) (same). And the default definition of "person" for all Oregon Revised Statutes also reflects that understanding. ORS 174.100(7) ("As used in the statute laws of this state, unless the context or a specially applicable definition requires otherwise *** '[p]erson' includes individuals, corporations, associations, firms, partnerships, limited liability companies and joint stock companies."); *see also* ORS 174.100(3) (1953) (same, except not including limited liability companies).

Animals have so far not been considered persons—either natural or artificial—capable of holding and asserting rights under the law. In the second book ("Of the Rights of Things") of his Commentaries, Blackstone regarded animals as property to which persons had an "absolute" rather than "qualified" right in possession:

"But with regard to *animals* which have in themselves a principle and power of motion, and (unless particularly confined) can convey themselves from one part of the world to another, there is a great difference made with respect to their several classes, not only in our law, but in the law of nature and of all civilized nations. They are distinguished into such as are *domitae*, and such as are *ferae naturae*: some being of a *tame* and others of a *wild* disposition. In such as are of a nature tame and domestic (as horses, kine, sheep, poultry, and the like), a man may have as absolute a property as in any inanimate beings."

Blackstone, 2 *Commentaries* at 313-14 (emphases in original).

Oregon law similarly regards animals as personal property, even as it recognizes that animals that are owned

or possessed by humans are a special form of property that may not be treated in the same absolute manner as inanimate personal property. ORS 498.002(1) ("Wildlife is the property of the state."); ORS 609.020 ("Dogs are hereby declared to be personal property."); ORS 167.310(9) (excepting "emergencies or circumstances beyond the reasonable control of the owner" from the duty to provide minimum care to an animal); *State v. Newcomb*, 359 Or 756, 767-68, 375 P3d 434 (2016) ("Oregon law prohibits humans from treating animals in ways that humans are free to treat other forms of property" and "places affirmative obligations on those who have custody of an animal to ensure that animal's basic welfare" with "no analogue [obligations] for inanimate property."); *State v. Nix*, 355 Or 777, 797, 334 P3d 437 (2014), *vac'd on other grounds*, 356 Or 768, 345 P3d 416 (2015) ("To be sure, Oregon law regards animals as the property of their owners."); *State v. Fessenden / Dicke*, 355 Or 759, 767-68, 333 P3d 278 (2014) (*Fessenden II*) ("Although Oregon's animal welfare statutes impose one of the nation's most protective statutory schemes, defendants are correct that Oregon law still considers animals to be property." (Footnote omitted.)); *McCallister v. Sappingfield*, 72 Or 422, 425, 144 P 432 (1914) (statute declaring dogs to be personal property is a "legislative declaration of the present-day common law" as "the natural evolution of the status of the dog as known at common law which considered the animal to be property, yet of an inferior sort"); *State v. Hume*, 52 Or 1, 5-6, 95 P 808 (1908) (recognizing the principle that wildlife, "animals *ferae naturae*," is property of the state held in trust for all its citizens); *State v. Hess*, 273 Or App 26, 35, 359 P3d 288 (2015), *rev den*, 358 Or 529 (2016) (adopting the court's reasoning in *Nix*). Accordingly, legal disputes involving animals generally turn on the property or privacy rights of persons. *State/Klamath County v. Hershey*, 370 Or 200, 515 P3d 899 (2022) (an owner does not have an Article I, section 17, right to a jury trial on a petition to forfeit an animal under ORS 167.347); *Newcomb*, 359 Or at 771-72 (a person has no cognizable Article I, section 9, property or privacy right in a lawfully-seized animal); *Bowden v. Davis et al*, 205 Or 421, 435-36, 289 P2d 1100 (1955) (a statute authorizing round up and summary sale or destruction of private horses found grazing on public range deprives persons of property without

due process); *Hofer v. Carson et al.*, 102 Or 545, 556-57, 203 P 323 (1922) (an ordinance authorizing summary destruction of dogs kept in violation of law does not violate due process despite depriving the owner of property without notice or a hearing); *State v. Schuman*, 36 Or 16, 24, 58 P 661 (1899) (a statute prohibiting sale of trout does not deprive a person of property without due process, "but qualifies or limits the rights appurtenant thereto").

Against that legal backdrop, it is not surprising that our examination of Oregon common law reveals no instance in which an animal, or a representative for that animal, has been permitted to bring a lawsuit to vindicate the animal's own ostensible rights. For her part, Mosiman acknowledges the lack of legal precedent for her position, but insists that there is no impediment to this court recognizing Justice the horse as a legal person. She contends that a "person" under the law is "any entity with legally protected rights to whom others owe a duty of care." In Mosiman's view, Justice and other animals qualify as legal "persons" because they are "entities who individually bear legally protected rights under Oregon's animal cruelty law." Mosiman reasons that Justice and other animals are owed a duty of "minimum care," ORS 167.310(9), and therefore have the right to be free from abuse and neglect. She further asserts that this court and the Oregon Supreme Court have recognized "that animals have legal rights and elevated legal status by virtue of the protections they receive" under the animal welfare statutes which "confer on animals a limited form of legal personhood."

We reject that argument. First, as explained above, only human beings and legal entities created by human beings are persons under Oregon common law. Animals are neither natural nor artificial persons. For purposes of the animal welfare statutes, an "animal" is "any nonhuman mammal, bird, reptile, amphibian or fish." ORS 167.310(3). The legislature did not create a legal entity called an "animal" with that definition, but rather identified a category of nonhuman beings. And nothing in the animal welfare statutes suggests that an animal is a legal entity capable of bearing and exercising its own rights.

Second, while we agree that Oregon's animal welfare statutes—"one of the nation's most protective statutory schemes," *Fessenden II*, 355 Or at 767—protect animals by imposing duties on persons to provide minimum care to an animal in the person's custody or control, we disagree that that statutory scheme confers legal rights on animals. Rather, those statutory duties qualify *a person's right* to exercise otherwise absolute dominion over personal property. It is true that Oregon law admirably recognizes that animals are sentient beings capable of experiencing pain, stress, and fear, ORS 167.305(1), and should be cared for in ways that minimize pain, stress, fear, and suffering, ORS 167.305(2). But insofar as Oregon law holds animals in higher esteem than other forms of property and imposes duties on persons intended to protect animals from suffering, it does so by qualifying individual rights of persons— that is, by "prohibit[ing] humans from treating animals in ways that humans are free to treat other forms of property." *Newcomb*, 359 Or at 768 (footnote omitted).

We also emphasize that neither this court nor the Oregon Supreme Court has suggested that an animal is a legal person with substantive or procedural rights. Although *Nix* ultimately was vacated, we adopted its reasoning in *Hess*. The court stated in *Nix* that, as a matter of statutory construction, an animal is a "victim" for purposes of the antimerger statute, ORS 161.067(2). 355 Or at 798; *see also Hess*, 273 Or App at 35. The court acknowledged that "the principal purpose of adopting the legislation that became [the animal welfare statutes] was to prevent the suffering of animals." *Nix*, 355 Or at 796. But the court underscored that its holding was limited:

> "In concluding that animals are 'victims' for the purposes of ORS 161.067(2), we emphasize that our decision is not one of policy about whether animals are deserving of such treatment under the law. That is a matter for the legislature."

*Id*. at 798. Significant to this case, *Nix* and *Hess* did not conclude that animals are crime victims afforded substantive or procedural rights under Article I, sections 42 and 43, of the Oregon Constitution or within the meaning of ORS 131.007 (defining "victim" as "the person or persons who have

suffered financial, social, psychological or physical harm as a result of a crime and includes, in the case of a homicide or abuse of corpse in any degree, a member of the immediate family of the decedent and, in the case of a minor victim, the legal guardian of the minor"). *Cf. State v. Teixeira*, 259 Or App 184, 190-92, 313 P3d 351 (2013) (concluding that ORS 131.007 and ORS 161.067 were not sufficiently related to or *in pari materia* with the sentencing guidelines so as to suggest a common meaning of the term "victim").

    We briefly clarify the holdings of two other cases that involved Article I, section 9, of the Oregon Constitution[9] in the context of animal abuse and neglect crimes. First, in *State v. Fessenden*, 258 Or App 639, 310 P3d 1163 (2013) (*Fessenden I*), *aff'd*, 355 Or 759 (2014) (*Fessenden II*), we held that the emergency aid exception to the Article I, section 9, warrant requirement permitted an officer to enter the defendant's property and seize a horse without a warrant:

> "[A] warrantless search or seizure is justified when law enforcement officers have an objectively reasonable belief, based on articulable facts, that the search or seizure is necessary to render immediate aid or assistance to animals that have suffered, or which are imminently threatened with suffering, serious physical injury or cruel death, unless that injury or death is being inflicted lawfully."

258 Or App at 649. We reasoned that the strong societal interest in animal protection reflected in Oregon's animal welfare statutes rendered warrantless state intrusion reasonable in such circumstances. *Id.* at 646-49.

    On review, the Supreme Court affirmed our decision on the grounds that a different Article I, section 9, warrant exception for exigent circumstances justified the warrantless state intrusion. *Fessenden II*, 355 Or at 765-66. The court reasoned that "when an officer has probable cause to believe that a person is violating [the animal welfare] statutes, the officer acts according to statutory standards and legislative policy, rather than the officer's own beliefs, in determining that a specific animal deserves and is in need of aid or protection." *Id.* at 772-74. Again, as in *Nix*, the court

---

[9] Article I, section 9, protects the right of "the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure."

emphasized the "narrow confines" of its holding that did "not extend the exigent circumstances exception." *Id.* at 774. The court did not hold, implicitly or otherwise, that animals are "persons" for purposes of Article I, section 9.

Second, in *Newcomb*, the Supreme Court concluded that a medical blood draw of a lawfully seized animal is not a "search" for purposes of Article I, section 9. 359 Or at 771-72. The court reasoned that a person has no protected property or privacy interest in a lawfully seized animal:

> "A dog is personal property under Oregon law, a status that gives a dog owner rights of dominion and control over the dog. But Oregon law simultaneously limits ownership and possessory rights in ways that it does not for inanimate property. Those limitations, too, are reflections of legal and social norms. Live animals under Oregon law are subject to statutory welfare protections that ensure their basic minimum care, including veterinary treatment. *The obligation to provide that minimum care falls on any person who has custody and control of a dog or other animal. A dog owner simply has no cognizable right, in the name of her privacy, to countermand that obligation.* That conclusion follows with equal or greater force when, as here, the dog is in the state's lawful protective custody on probable cause that the dog is suffering injury as a result of neglect, at which point the owner has lost her property rights of dominion and control over the dog. An examination of the dog's physical health and condition in that circumstance, pursuant to a medical judgment of what is appropriate for diagnosis and treatment, is not a form of governmental scrutiny that, under legal and social norms and conventions, invades a dog owner's protected privacy rights under Article I, section 9."

*Id.* (emphasis added and footnote omitted).

To summarize, *Nix*, *Fessenden*, and *Newcomb* make clear that Oregon law continues to regard animals as property—even as legal and social norms for the care and welfare of animals continue to evolve—and that the legislature is the proper forum to determine, as a matter of policy, how the law should treat animals. Those cases also make clear that the statutory protections Oregon affords to animals do not confer substantive or procedural legal rights on animals; rather, they qualify a person's right to own and

possess animals—*and* they further qualify a person's rights under Article I, section 9, to be free from governmental scrutiny when there is an objectively reasonable basis to believe that the person has violated the statutory duty to provide minimum care to an animal.

Finally, we acknowledge that the common law is not "static or unchanging" and that it "has continued to evolve as the premises on which it rests have changed." *Horton v. OHSU*, 359 Or 168, 182, 376 P3d 998 (2016). To that end, we may reconsider a common-law rule or doctrine[10] when (1) "an earlier case was inadequately considered or wrong when it was decided," (2) "surrounding statutory law or regulations have altered some essential legal element assumed in the earlier case," or (3) "the earlier rule was grounded in and tailored to specific factual conditions and some essential factual assumptions of the rule have changed." *G. L. v. Kaiser Foundation Hospitals, Inc.*, 306 Or 54, 59, 757 P2d 1347 (1988). But "[w]ithout some such premise, the court has no grounds to reverse a well-established rule besides judicial fashion or personal policy preference, which are not sufficient grounds for such a change." *Id.*

Considering those factors, we see no reason to depart from the well-settled common-law doctrine regarding who is a person with the capacity to sue to vindicate personal rights in an Oregon court. Although Oregon law has evolved beyond Blackstone's understanding of animals as personal property over which persons may exercise *absolute* rights of dominion and control, Oregon's animal welfare statutes have not altered the essential legal element assumed in our common law: that animals are not "persons" capable of bearing rights, but "things" over which persons may exercise *qualified* rights. We agree with the trial court that holding that the named plaintiff is a legal person with

---

[10] We assume without deciding that it is within our judicial power to modify the common law to recognize an entirely new class of persons with rights and the capacity to redress violations of rights in court. However, we are not aware of any case in which an Oregon court has recognized a new class of persons solely under the common law, rather than under a statute or constitutional provision. *See, e.g.*, *Mallison v. Pomeroy*, 205 Or 690, 697, 291 P2d 225 (1955) (holding that a "viable" unborn child is a "person" for purposes of Article I, section 10, of the Oregon Constitution and recognizing an action for wrongful death of a stillborn child).

the capacity to sue for damages in tort would have profound implications. We, too, are unable to take that leap.

In sum, only human beings and human-created legal entities are persons with rights and the capacity to sue under Oregon law. Justice the horse is neither a human being nor a legal entity and therefore does not have legal rights or the capacity to sue to vindicate ostensible rights in an Oregon court. Under Oregon law, animals are property, albeit of a unique kind. The statutory duty to provide minimum care to an animal in the custody and control of a person does not confer substantive or procedural legal rights on the animal; rather, such duties qualify a person's right over a special form of property—one that is sentient and capable of experiencing pain, stress, fear, and suffering. That the legislature intended to protect animals from needless suffering does not change that legal reality, and neither we nor the Oregon Supreme Court has suggested otherwise. Assuming without deciding that we have authority to modify the common law to recognize an entirely new class of persons capable of bearing and asserting rights, we decline to do so here.

We emphasize that our decision does not foreclose Oregon law from ever recognizing an animal as a person or a legal entity,[11] but also that the courts are not the proper forum to achieve that goal. We affirm for now the sentiments the court articulated in *Fessenden II*:

> "As we continue to learn more about the interrelated nature of all life, the day may come when humans perceive less separation between themselves and other living beings than the law now reflects. However, we do not need a mirror to the past or a telescope to the future to recognize that the legal status of animals has changed and is changing still, or to agree with defendants that, at this moment in time, Oregon law does not protect animal life to the same extent or in the same way that it protects human life."

---

[11] Nor do we foreclose the possibility that, as the trial court aptly observed, the legislature could create a limited statutory cause of action allowing a person to sue on behalf of an animal for specified damages in specific instances. *See Deckard v. Bunch*, 358 Or 754, 759, 370 P3d 478 (2016) ("Statutory liability 'arises when a statute either expressly or impliedly creates a private right of action for the violation of a statutory duty.'" (Quoting *Doyle v. City of Medford*, 356 Or 336, 344, 337 P3d 797 (2014).)).

355 Or at 769-70. Although Oregon law recognizes an animal's sentience and ability to experience pain, stress, fear, and suffering, it does not currently recognize an animal's legal capacity to hold rights and assert them in court.

Affirmed.